**A.W. FINANCIAL SERVICES, S.A., as successor in interest to Tertiaire Investissement, S.A., Plaintiff Below, Appellant,**

v.

**EMPIRE RESOURCES, INC., American Stock Transfer & Trust Company and Affiliated Computer Services, Inc., Defendants Below, Appellees.**

No. 55, 2009.

Supreme Court of Delaware.

Submitted: July 8, 2009.

Decided: Sept. 15, 2009.

---

**25.** *Id.* at 1721 (citing *United States v. Ross*, 456 U.S. 798, 820–21, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)).

Douglas A. Shachtman, Esquire, of Douglas A. Shachtman & Associates, Wilmington, Delaware; Of Counsel: Jon Schuyler Brooks, Esquire (argued), of Phillips Nizer LLP, New York, New York; for Appellant.

Collins J. Seitz, Jr. and Matthew F. Boyer, Esquires, of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware; Of Counsel: Richard L. Levine (argued) and Deborah A. Maher, Esquires, of Weil, Gotshal & Manges LLP, New York, New York; for Appellee Empire Resources, Inc.

Charles A. McCauley III and Kellie M. MacCready, Esquires, of Obermayer Rebmann Maxwell & Hippel LLP, Wilmington, Delaware; Of Counsel: Steven A. Haber, Esquire (argued), of Obermayer Rebmann Maxwell & Hippel LLP, Philadelphia, Pennsylvania; for Appellees American Stock Transfer & Trust Company and Affiliated Computer Services, Inc.

Before STEELE Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice.

The United States District Court for the Southern District of New York (The Honorable Sidney H. Stein) (the "Southern District") has certified to us, under Article IV, § 11(8) of the Delaware Constitution and Rule 41 of this Court,[1] four questions relating to Delaware's Escheat Statute. Those questions arose in a pending action in the Southern District brought by plaintiff, A.W. Financial Services, S.A. ("A.W. Financial"), a corporation that owned shares of Empire Resources, Inc., a Delaware corporation ("Empire").[2] In that action, A.W. Financial alleges that the defendants, Empire, American Stock Transfer & Trust Company ("American Stock") and Affiliated Computer Services, Inc. ("ACS") caused A.W. Financial's shares of Empire to be escheated in violation of Delaware's escheat law. The defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted. The Southern District determined that the dismissal motion raised novel questions of Delaware law that this Court should first decide, and certified those questions to us *sua sponte*. This Court accepted certification on February 20, 2009, and after the matter was briefed, oral argument was held on July 8, 2009. This is the Opinion of the Court on the certified questions.

### The Relevant Facts [3]

In 1994, Tertiaire Investissment S.A. ("Tertiaire"), the predecessor in interest to

1. DEL. CONST art. IV, § 11(8) grants this Court jurisdiction "[t]o hear and determine questions of law certified to it by ... a United States District Court...." Supreme Court Rule 41(a)(ii) authorizes "... a United States District Court ..., on motion or *sua sponte*, [to] certify to this Court for decision a question or questions of law arising in any matter before it prior to the entry of final judgment or decision if there is an important and urgent reason for an immediate determination of such question or questions by this Court and the certifying court ... has not decided the question or questions in the matter."

2. *A.W. Fin. Serv., S.A. v. Empire Res., Inc.*, 07 Civ. 8491(SHS) (S.D.N.Y.2008) (the "Southern District action").

3. The facts recited here are derived from the Order & Certificate of Questions of Law en-

A.W. Financial, purchased 40 shares of Integrated Technology USA, Inc., which later merged with Empire. As a result of the merger, Tertiaire's 40 shares of Integrated Technology became 30,426 shares of Empire.

In 2000, "Tertiaire Investissement S.A.," which had become "Tertiaire Development S.A.," wrote a letter to Empire inquiring about its shares. American Stock, which was Empire's transfer agent, responded that "[W]e acknowledge your recent letter regarding the loss of the above certificates ... against which we have placed a 'STOP TRANSFER' notation on our records." American Stock asked Tertiaire to submit an "Affidavit of Loss and Indemnity Agreement" and to purchase a surety bond, for American Stock to provide Tertiaire a replacement certificate for its Empire shares. In fact, Tertiaire had not lost its original stock certificate, as it had never gotten one in the first place. Nonetheless, Tertiaire submitted the requested affidavit and purchased the surety bond, and received a replacement certificate from American Stock less than a week later.

In 2004, four years and five months after Tertiaire obtained the replacement stock certificate, Tertiaire's shares of Empire were delivered to the State of Delaware as escheated property, allegedly by Empire, either directly or through American Stock. It appears from the record in the Southern District action that A.W. Financial (the successor in interest to Tertiaire) does not know how or why the defendants determined that Tertiaire's shares of Empire had become escheatable, what role each defendant played in the escheatment, or how ownership of the shares was transferred to Delaware (i.e., by means of a duplicate stock certificate or some other means). A.W. Financial alleges, however, that in 2006, it wrote Empire, requesting that its shares be re-registered under its new name, "A.W. Financial Services S.A.," and that shortly thereafter, A.W. Financial learned that "... the Empire shares owned by Tertiaire had been escheated by Empire, through its authorized agent [American Stock] to the State of Delaware, through [ACS]." [4]

A.W. Financial then instituted the Southern District action, claiming that its shares of Empire had been turned over to the State of Delaware in violation of Delaware's escheat law. A.W. Financial claims that under Delaware's Escheat Statute then in effect, stock does not qualify as escheatable until it has been dormant for at least five years. The Empire stock at issue here (A.W. Financial claims) was escheated before the five year dormancy period had elapsed. A.W. Financial asserts various causes of action, including negligence, breach of contract, breach of fiduciary duties and conversion. It seeks compensatory damages from all defendants and specific performance from Empire.[5]

---

tered by District Judge Stein on January 29, 2009.

4. ACS, the third named defendant in the Southern District action, worked with American Stock to find escheated shares and, through a contract with the State of Delaware, allegedly sold A.W. Financial's shares of Empire after they had been turned over to the State.

5. The allegedly wrongful escheatment did not cause A.W. Financial to lose the entire value

of its stock. After A.W. Financial contacted Delaware about its escheated shares, the State of Delaware remitted to A.W. Financial the money Delaware made in selling them. The compensatory damages relief that A.W. Financial seeks is additional compensation beyond what it has already obtained from Delaware, claimed to equal at least $870,487, representing "the difference between the value of the shares when liquidated by the State of Delaware and [their increased value] ... when A.W. Financial first inquired about selling them."

The defendants moved to dismiss all of A.W. Financial's claims, contending that A.W. Financial has failed to state a claim upon which relief can be granted under each of its causes of action. The defendants also maintain that they are immune from suit under the Delaware Escheat Statute, 12 *Del. C.* § 1203. The parties' colliding contentions on the dismissal motion raised novel questions of Delaware law that led Judge Stein to certify to this Court, and this Court to address, the four questions next set forth.

### The Certified Questions of Law

I. Effective June 30, 2008, the Delaware legislature amended the Delaware escheat law, Del.Code Ann. tit. 12, § 1198(9), by changing the definition of "period of dormancy" for stocks. *See* 76 Del. Laws 276 (2008). Does that new definition apply retroactively in civil actions involving stocks that were escheated prior to June 30, 2008?

II. Plaintiff alleges that defendants incorrectly determined that its stock was escheatable and, as a result, improperly transferred its stock to the State of Delaware. On what legal theory, if any, can plaintiff base a civil action against defendants: negligence, conversion, breach of fiduciary duty, "failure to register," or some other cause of action?

III. Delaware's escheat law, Del.Code Ann. tit. 12, § 1203, grants immunity in two circumstances. Subsection 1203(a) grants immunity to any "holder" of "property"—including "intangible ownership interests in corporations"—that "pay[s] or deliver[s]" that property to the State Escheator. Subsection 1203(b) grants immunity to a "holder and any transfer agent" that "deliver[s] in good faith" a "duplicate certificated security to the State Escheator." In a case such as this involving the escheatment of stock, which applies: subsection 1203(a), subsection (b), or both?

IV. When are allegations sufficient to plead that a party did not act in "good faith"—and thus is not entitled to immunity—under subsection 1203(b) of Del.Code Ann. tit. 12, § 1203?

\* \* \*

We address these questions in the above order. Our answers, and the reasons therefor, are set forth in the analysis that follows.

### Answers To Questions And Reasons Therefor

#### Question No. 1:

Effective June 30, 2008, the Delaware legislature amended the Delaware escheat law, Del.Code Ann. tit. 12, § 1198(9), by changing the definition of "period of dormancy" for stocks. See 76 Del. Laws 276 (2008). Does that new definition apply retroactively in civil actions involving stocks that were escheated prior to June 30, 2008?

*Answer:* No.

*Discussion:*

This question arises because if the 2008 amendment is retroactive, the new, three year period of dormancy would have run before property was escheated to the State of Delaware. That result would eliminate A.W. Financial's claim in the Southern District action that its Empire stock was wrongfully escheated.

 In Delaware, there is a "presumption against retroactivity."[6] Laws apply retroactively only where the General Assembly has made its intent plain and unambiguous.[7] Here there is no expressed statutory intent, let alone one that is plain and unambiguous, that the 2008 amendment have retroactive effect. That is, there is no evidence to support the defendants' argument that the General Assembly intended for the statutory revision to apply retroactively.

 This Court has recognized that a statutory amendment "may apply retroactively" if it is remedial,[8] but that rule has no application here. A statute is remedial where it relates to "practice, procedure or remedies and does not affect substantive or vested rights."[9] The 2008 amendment to the Escheat Statute, which shortened the period of dormancy from five to three years, affects a substantive right, not "practice, procedure or remedies." The effect of the amendment is to permit the State to divest a stockholder of a Delaware corporation of a property right (ownership interest in the stock)[10] two years earlier than was previously permitted under the pre–2008 law. That, without more, makes the amendment substantive. The amendment is also substantive because, if applied retroactively, it would divest pre-amendment stockholders of Delaware corporations of a property right by government action without affording them prior notice and an opportunity to be heard. Stated differently, retroactive application would facilitate the taking of property without due process, which is a substantive right.[11] Accordingly, the 2008 amendment does not operate retroactively.

*Question No. 2:*

Plaintiff alleges that defendants incorrectly determined that its stock was escheatable and, as a result, improperly transferred its stock to the State of Delaware. On what legal theory, if any, can plaintiff base a civil action against defendants: negligence, conversion, breach of fiduciary duty, "failure to register," or some other cause of action?

*Answer:*

 Claims for wrongful escheatment brought by a property owner against the State of Delaware based on common law causes of action are superseded by the Escheat Statute and, therefore, are not available. Not superseded, however, are common law or statutory causes of action brought against parties, other than the State, that are involved in an escheat transaction. Those claims remain available. Some causes of action or legal theories identified in this question would be available to an owner of securities claiming that its property was wrongfully escheated, but the current record does not enable us to opine on every cause of action that might be available under Delaware law in this particular case. Nor do we express any opinion on the separate question of

---

**6.** *State ex. rel. Brady v. Pettinaro Enter.*, 870 A.2d 513, 529 (Del.Ch.2005); see also, *Keller v. Wilson*, 190 A. 115, 125 (Del.1936).

**7.** *Monacelli v. Grimes*, 99 A.2d 255, 267 (Del. 1953); *Chrysler Corp. v. State*, 457 A.2d 345, 351 (Del.1983) (laws will not be given retrospective operation "unless it be plainly and unmistakably so provided by the statute.").

**8.** *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 354 (Del.1993).

**9.** *Id.*

**10.** Among other things, "property" includes "intangible ownership interests in corporations, whether or not represented by a stock certificate...." 12 *Del. C.* § 1198(11).

**11.** *See Monacelli*, 99 A.2d 255.

whether a cognizable claim for relief under any of those legal theories has been pleaded, because that is for the court in the Southern District action to decide on the pending motion to dismiss.

## Discussion:

Before we commence our analysis, some prefatory observations are in order. Although this question asks which causes of action are available to A.W. Financial, the parties have interpreted the question to include a threshold issue, namely, whether the Escheat Statute "preempts" (*i.e.*, supersedes) all common law claims for wrongful escheat against all parties, except as authorized by the statute itself. Since that threshold issue has been briefed [12] and, thus, has become pivotal to the analysis, we address it first. We then turn to the specific issue posed by the question, *i.e.*, which causes of action are available?

### A. *Are All Common Law Claims Statutorily Superseded?*

■■ The threshold issue is whether the Escheat Statute has preempted common law or statutory causes of action other than those specifically authorized by the statute itself. Before addressing that issue, we first clarify the operative terminology. There is a distinction between the concepts of "preemption," on the one hand, and "superseder," on the other. Although "preempt" and "supersede" are terms that are often used interchangeably, they have different meanings. "Preemption" refers to circumstances where the law of a superior sovereign takes precedence over the laws of a lesser sovereign; for example, a federal law preempting a state law or a state law preempting a city or county ordinance. "Superseder" describes circumstances where a statute replaces or ousts ("supersedes") the common law.[13] This latter term more accurately describes the issue presented here, which is whether the Escheat Statute supersedes all common law causes of action.[14]

■ The Delaware cases do not embody a uniform approach to superseder analysis,[15] but they are consistent with the

12. Regrettably, the briefing on this issue may be less than complete. In its opening brief, A.W. Financial does not raise or discuss the "preemption" issue, and argues only why causes of action for negligence, conversion, breach of fiduciary duty and "failure to register" are available against the defendants. Portions of that argument are conclusory in nature. In their answering brief, defendants American Stock and ACS argue that this certified question deals *only* with the issue of preemption. Accordingly, their response does not even address the availability of specific causes of action. Defendant Empire joins in the American Stock and ACS response, and cursorily responds to the arguments in A.W. Financial's opening brief. In its reply brief, A.W. Financial never returns to its original arguments, and addresses only the "preemption" issue.

13. *See* BLACK'S LAW DICTIONARY 1177 (6th ed. 1990) ("Preemption" is the "[d]octrine ... that certain matters are of such a national, as opposed to local, character that federal laws preempt or take precedence over state laws.... As applied to state action versus local action, 'preemption' means that where legislature has adopted scheme for regulation of given subject, local legislative control over such phases of subject as are covered under state regulation ceases."). *Compare Id.* at 1437 ("Supersede" means "[o]bliterate, set aside, annul, *replace, make void, inefficacious or useless, repeal.*") (emphasis added).

14. *See, e.g., Cline v. Prowler Indus. of Maryland, Inc.,* 418 A.2d 968, 978–80 (Del.1980) (analyzing legislative history and concluding that the General Assembly intended to supersede strict tort liability in cases involving a sale of goods, by adopting the Uniform Commercial Code ["UCC"] ).

15. *See, e.g., id; Acierno v. Worthy Bros. Pipeline Co.,* 656 A.2d 1085, 1090–92 (Del.1995) (analyzing text and legislative history of UCC

principles that "[t]he common law is not repealed by statute unless the legislative intent to do so is plainly or clearly manifested[,]"[16] and that "any such repeal is not effected to a greater extent than the unmistakable import of the [statutory] language used."[17] Although a statute that is inconsistent with common law, or that undertakes to revise and cover the entire subject matter, may implicitly repeal common law, repeal by implication is disfavored, and is deemed to occur only "where there is fair repugnance between the common law and the statute, and both cannot be carried into effect."[18]

Although preemption and superseder are analytically distinct concepts, they both involve the same inquiry: has one body of law replaced another? For that reason, the preemption analytical framework is a useful tool to conduct our analysis of whether the Escheat Statute has superseded common law claims.

In *Gulko v. General Motors Corp.*,[19] we described the preemption analytical framework (under federal law) as follows:

> There are only three ways in which federal preemption can occur: (a) where Congress explicitly preempts state law; (b) where preemption is implied because Congress has occupied the entire field; or (c) where preemption is implied because there is an actual conflict between federal and state law.[20]

and concluding that UCC did not supersede common law doctrine of accord and satisfaction); *Schuster v. Derocili*, 775 A.2d 1029 (Del.2001) (later superseded by statute, 19 *Del. C.* 712(b)) (analyzing Discrimination in Employment Statute, underlying public policy of statute, and case law to conclude that Discrimination in Employment Statute did not preclude common law suit for breach of good faith and fair dealing exception to employment-at-will doctrine); *New Haverford P'ship v. Stroot*, 772 A.2d 792, 797–98 (Del.2001) (rejecting claim that Landlord Tenant Code abolishes all common law tort liability unless plaintiff can establish negligence *per se*, because Landlord Tenant Code did not disclose a legislative intent to preclude tort claims against landlords).

**16.** 15A C.J.S. *Common Law* § 16; *see also State v. Rogers* 820 A.2d 1171, 1177 (Del.Super.2003) ("[T]enets of statutory construction guide the [c]ourt's analysis. 'There is a presumption that a statute is consistent with the common law, and so a statute creating a new remedy or method of enforcing a right which existed before is regarded as cumulative rather than exclusive of the previous remedies.' " (quoting 2B Sutherland *Statutes & Statutory Construction* § 50:05 (6th ed.2000)).

**17.** 15A C.J.S. *Common Law* § 16; *see also Norfolk Redevelopment and Hous. Auth. v. Chesapeake and Potomac Tel. Co. of Virginia*, 464 U.S. 30, 35, 104 S.Ct. 304, 78 L.Ed.2d 29 ("It is a well-established principle of statutory construction that [t]he common law ... ought not to be deemed repealed, unless the language of a statute be clear and explicit for this purpose." (quotation marks omitted, ellipsis in original).

**18.** 15A C.J.S. *Common Law* § 16; *Cantinca v. Fontana*, 884 A.2d 468, 473–74 (Del.2005) (analyzing whether a county ordinance was preempted):

> Legislative intent to make a state statute exclusive of any regulation of the same subject matter by a political subdivision may be express or implied. Express exclusivity intent exists where the statutory text or legislative history explicitly provides or demonstrates that the state statute is intended to replace or prevail over any pre-existing laws or ordinances that govern the same subject matter. Implied exclusivity intent may be found where the two regulations are inconsistent; for example, where a state statute prohibits an act that is permitted by a local ordinance. To be inconsistent by implication, however, the local ordinance must hinder the objectives of the state statute. (citations omitted).

**19.** 710 A.2d 213 (Del.1997).

**20.** *Id.* at 215 (citing *English v. Gen. Elec. Co.* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65) (1990)); *compare Cantinca*, 884 A.2d at 473–74.

Applying this analysis to the superseder issue before us, the three-pronged inquiry would be: (1) does explicit language in the Escheat Statute supersede or limit the common law; (2) does the statutory scheme evidence a legislative intent to occupy the field; and (3) does the statutory scheme actually conflict with the common law? We conclude that the answer to all three inquiries is no.

*The Statute Contains No Language That Explicitly Supersedes Common Law Claims*

■ For there to be an explicit superseder, the statute must clearly manifest a legislative intent to repeal the common law. The Escheat Statute contains no language indicating any intent to repeal, wholesale, all common law claims. Nowhere in the statute do phrases appear such as supersede (or supersede), repeal, revoke or preempt. Moreover, the term "common law" appears only once, in a wholly unrelated context.[21] In this regard the Escheat Statute is to be contrasted with the Worker's Compensation Act and the Delaware Criminal Code, which do contain clear superseder language. The Worker's Compensation Act provides:

*Compensation as exclusive remedy.* Every employer and employee, adult and minor, except as expressly excluded in this chapter, shall be bound by this chapter respectively to pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence and *to the exclusion of all other rights and remedies.*[22]

The Criminal Code similarly provides that "[n]o conduct constitutes a criminal offense unless it is made a criminal offense by this Criminal code or by another law...."[23]

No provisions of the Escheat Statute evidence an intent to supersede common law claims. Indeed, the Escheat Statute contains language that evidences the opposite intent—that is, the intent not to oust common law liability, but rather to immunize holders and related parties from liability in specified circumstances. One need look no further than to the immunity provision, 12 *Del. C.* § 1203, which pertinently provides, in subsection (a), that:

[t]he payment or delivery of property to the State Escheator by any holder ... shall release and discharge such holder from any and all liability to the owner ... by reason of such delivery or payment ... and such delivery and payment ... shall be a conclusive defense in any suit or action brought by such owner ... by reason of such delivery or payment.

In subsection (b), Section 1203 similarly provides that:

[u]pon the delivery in good faith of a duplicate certificated security to the State Escheator or the registration of an uncertificated security to the State Escheator ... the holder and any transfer

**21.** See 12 *Del. C.* § 1198(9)(b) ("A full period of dormancy shall be deemed to have run with respect to any dividends or other distributions held for or owing to an owner at the time a period of dormancy shall have run with respect to the intangible ownership interest in a ... *statutory or common law trust* ....") (emphasis added).

**22.** 19 *Del. C.* § 2304 (emphasis added); see also, *Baker v. Smith & Wesson Corp.,* 2002 WL

31741522 at *4 (Del.Super.Nov.27, 2002) ("[T]he Workers' Compensation Act has largely replaced tort law as it applied to injured workers and their employers.").

**23.** 11 *Del. C.* § 202; see also *Baker,* 2002 WL 31741522 at *4 ("And, until the current Criminal Code was enacted by the General Assembly in 1973, it was possible to prosecute for common-law crimes.") (internal citations omitted).

agent, registrar, or other person acting for or on behalf of the holder ... is relieved of all liability of every kind to every person.

These immunity provisions would be superfluous and unnecessary if the Escheat Statute superseded all common law causes of action. Were that the case, there would exist no predicate "liability ... to every person" to be immunized against. Nor would there be any need to denominate the delivery of property to the State Escheator as a "conclusive defense in any suit or action brought by such owner."

Accordingly, the Escheat Statute fails to satisfy the first preemption inquiry.

*The Escheat Statute Does Not Occupy the Field So Totally As To Imply Superseder Except For Claims Against The State of Delaware*

 A statute that "undertakes to revise and cover the whole subject matter" may impliedly supersede the common law. Such implied repeal is disfavored, however, and may be found only if there is "fair repugnance" between the statute and common law; that is, if they are inconsistent.[24] With one exception, the Escheat Statute does not impliedly supersede other areas of the common law, because there is no "fair repugnance" between the statute and common law areas that are not related to escheat.

Here, a page of history is instructive. Escheat itself originated as a common law doctrine of feudal origin that governed the reversion of real property to the sovereign.[25] *Bona vacantia* was the related common law doctrine (often confused with escheat) that governed the appropriation of abandoned personal property by the sovereign.[26] Both bodies of common law—escheat and *bona vacantia*—later became superseded by the escheat statutes, including Delaware's. To be accurate, Delaware's Escheat Statute does create a comprehensive scheme governing the reversion of both real and personal property to the State. So clearly, there is "fair repugnance" between the common law doctrines of escheat and *bona vacantia* and the Escheat Statute, because those common law doctrines cannot be given effect without conflicting with the statutory provisions and scheme of the Escheat Statute.

Consistent with that statutory history, two statutory provisions evidence a legislative intent to occupy the field, and thereby implicitly supersede common law claims against the State Escheator. Those provisions are 12 *Del. C.* §§ 1206 and 1146(b). Section 1206 provides:

(a) Any person claiming an interest in any property paid or delivered to the State Escheator under this subchapter may file a claim thereto or to the pro-

---

**24.** 15A C.J.S. *Common Law* § 16.

**25.** *See* 27A Am Jur. 2D *Escheat* § 1 ("The doctrine of escheat has its origin in feudal notions of real property ... which reverted to, or devolved on, the feudal lord upon failure of heirs of the original grantee. Early English common law also included the concept of 'bona vacantia,' or personal property without an owner, which also became the property of the crown. The doctrine of bona vacantia was soon blended into that of escheat, so the term 'escheat' now includes the transfer of personal property to the state.").

**26.** *See Delaware v. New York,* 507 U.S. 490, 498 n. 9, 113 S.Ct. 1550, 123 L.Ed.2d 211 (1993) ("At common law, abandoned personal property was not the subject of escheat, but was subject only to the right of appropriation by the sovereign as *bona vacantia.* Our opinions, however, have understood 'escheat' as encompassing the appropriation of both real and personal property, and we use the term in that broad sense.") (internal citations and quotations omitted).

ceeds from the sale thereof with the State Escheator.

(b) The determination of claims and rights of appeal shall be accomplished as prescribed in § 1146(b) of this title.

(c) When property is paid or delivered to the State Escheator under this subchapter, the owner is not entitled to receive income or other increments accruing thereafter.[27]

As referenced in Section 1206(b), Section 1146(b) prescribes the procedure that must be followed to pursue claims against the State Escheator. The section provides:

The State Escheator shall possess full and complete authority to determine all such claims and shall forthwith send written notice of such determination to the claimant. At any time within 4 months thereafter such claimant may apply for a hearing and determination of claim by the Tax Appeal Board. The procedure before the Tax Appeal Board for such hearings shall be the same as that provided for by § 329 of Title 30 and the Board shall have the same power to compel the attendance of witnesses and the production of evidence as is provided in § 330 of Title 30.[28]

■ Thus, the Escheat Statute has superseded both the common law doctrines of escheat and *bona vacantia,* as well as common law claims, arising out of an escheat, brought against the State of Delaware. It does not follow, however, that the statute supersedes common law escheat-related claims against third parties, *i.e.,* the tort, contract and agency doctrines that underlie A.W. Financial's claims in its Southern District lawsuit.[29]

Only if the Escheat Statute creates a comprehensive scheme that is inconsistent with the remainder of the common law could an implied superseder be found. No such comprehensive scheme is created by the Delaware Escheat Statute.

The defendants contend that the Escheat Statute creates a scheme for the disposition of abandoned property so comprehensive that to permit the bringing of common law causes of action would frustrate it. In support of that argument the defendants point to 12 *Del. C.* §§ 1146 and 1206, which we have quoted above. These provisions, the defendants argue, evidence a legislative intent to occupy the field such that an owner whose property is wrongfully escheated may seek relief only by filing a claim with the State Escheator, but cannot bring any claim for relief of any kind against anyone else who played a role in the escheat process. That argument finds no support in the language of the Escheat Statute or in the historical context leading to the enactment of escheat statutes generally.

First, if the Escheat Statute were intended as the owner's sole and exclusive remedy, there would be no need or purpose for the immunity provisions of Section 1203(a), which provides that delivery of property to the State Escheator "shall be a conclusive defense in any suit or action brought by such owner;" or for Section 1203(b), which provides that "the delivery in good faith" of a duplicate certified security, or registration of an uncertificated security, to the State Escheator, will relieve "the holder and any transfer agent,

---

27. 12 *Del. C.* § 1206.

28. 12 *Del. C* § 1146(b).

29. Delaware case law implicitly recognizes that a single comprehensive statutory scheme may supersede one common law doctrine without superseding another common law doctrine. *Compare Cline v. Prowler Indus. of Maryland, Inc.,* 418 A.2d 968, 978–80 (Del. 1980), with *Acierno v. Worthy Bros. Pipeline Co.,* 656 A.2d 1085, 1090–92 (Del.1995).

registrar, or other person acting for or on behalf of the holder ... of all liability of every kind to every person." Moreover (and as discussed in our response to Question No. 3), under subsection (b) a delivery of securities to the State Escheator not made in good faith is not immunized. Those provisions cannot be reconciled with any notion that the Escheat Statute provides the sole remedy for wrongful escheats, exclusive of any and all remedies available at common law.

Second, the historical context also deprives the defendants' argument of support. "[L]egislation must be interpreted in the light of the common law and the scheme of jurisprudence existing at the time of its enactment."[30] Under English common law, the Crown (or its officers) could not be sued without its consent, even if the escheated property was not legally abandoned.[31] Parliament, however, created a process that allowed for a waiver of sovereign immunity, yet also reserved the right to reassert sovereign immunity.[32] That history teaches that without any provision in the Escheat Statute authorizing a claim against the State Escheator, the owner would be barred from seeking compensation from the State under sovereign immunity. The General Assembly needed to—and did—create a statutory claims procedure against the State Escheator. The mere existence of such a procedure however, cannot be fairly read to evidence a scheme so comprehensive that it must be read to impliedly supersede all common law causes of action against third parties.[33]

The Escheat Statute thus fails to satisfy the second preemption inquiry.

*Common Law Causes of Action Are Not Inconsistent With The Escheat Statute*

The third inquiry is whether the Escheat Statute is inconsistent with common law causes of action. The short answer is that it is not. As earlier noted, the Escheat Statute, in 12 *Del. C.* § § 1203(a) and (b), provides immunity from liability in specified circumstances. Immunity should not be conflated with superseder. By way

---

**30.** 2B Sutherland *Statutes & Statutory Construction* § 50:01 (7th ed.).

**31.** James Leonard, *Ubi Remedium Ibi Jus, Or Where There's a Remedy, There's a Right: A Skeptic's Critique of Ex Parte Young,* 54 SYRACUSE L.REV. 215, 237 (2004):

> Property to which the Crown had gained title—for example by escheat—might be sold before a title dispute could be heard. Thus in the fourteenth century, Parliament established the statutory remedy of monstrans de droit, which allowed claimants to try title to land without securing the Crown's specific permission. The requirement of formal consent eventually became so perfunctory that it was ignored.... These devices are perhaps more analogous to direct waivers of sovereign immunity since the typical claimants proceeded against the Crown by name, attempting to challenge the Crown's title or to reach the Treasury, and went forward with the Crown's actual or implicit consent. (internal citations omitted).

**32.** *See Id.* at 331–32:

> Early appearances of officer suits in the English courts are marked by the consent of the Crown or Parliament. The writ of disseisin against the King's officers under the Statute of Westminster I of 1275 represented legislative waiver of immunity, as did the monstrans de droit of the fourteenth century that permitted actions to recover lands escheated to the Crown. Petitions of right to proceed against the government were issued on the authority of the Crown. While it is true that requests for permission to sue Crown officials were in time perfunctorily given and that eventually the requirement was either ignored or obviated by prerogative writs, there is also no question that Parliament could have restored these requirements had it chosen to do so. (internal citations omitted).

**33.** *State v. Rogers,* 820 A.2d 1171, 1177 (Del.Super.2003).

of analogy, a private citizen who is wrongfully injured by a peace officer may sue the officer in tort for relief. In Delaware, as in most states, however, qualified immunity generally shields the peace officer from liability. What is important analytically is that qualified immunity does not supersede the common law of tort. Rather, it provides the officer a legal defense—immunity. The legislative creation of immunity from liability implies that without immunity there would be liability, that would be based on a valid claim for relief under common law. As earlier noted, if common law causes of action were inconsistent with the Escheat Statute, then there would be no need for immunity from liability, since there would be no liability from which to grant immunity.

The argument that the Escheat Statute is inconsistent with common law causes of action is also irreconcilable with Section 1203(c), which provides:

> If the holder pays or delivers property to the State Escheator in good faith and thereafter another person claims the property from the holder ..., the State Escheator acting on behalf of the State, upon written notice of the claim, shall defend the holder against the claim and indemnify the holder against any liability on the claim.[34]

To paraphrase, Section 1203(c) explicitly provides that where another person claims the escheated property directly from the holder, the State Escheator shall "defend the holder against the claim and indemnify the holder against any liability on the claim." The "claim" that the State Escheator is required to "defend" and "indemnify" against, most likely means a lawsuit asserting a common law cause of action, brought by a third party against the holder. There would be no need for this provision allowing a third party to sue (and requiring the State Escheator to defend and indemnify the holder) if the Escheat Statute supersedes all common law claims and permits only a claim against the State Escheator.

For these reasons, there is no legal basis to conclude that the Escheat Statute supersedes all common law causes of action.

## B. Available Causes of Action

To promote clarity, the question is answered separately with respect to each cause of action identified therein.

*Negligence and Conversion:* That Delaware recognizes causes of action for damages based on theories of negligence and conversion is a proposition so basic as to require no citation. Clearly, negligence and conversion claims are "viable" under Delaware law.[35] Whether either theory has been adequately pleaded is not before us, and must be for the Southern District to decide in the action before it.

■ *Breach of Fiduciary Duty:* Although a claim for damages for breach of fiduciary duty is cognizable under Delaware law, that claim presupposes that the defendants are "fiduciaries" that owed fiduciary duties to the plaintiff. Clearly the issuing corporation, Empire, is not a fiduciary to the plaintiff, which is its stockholder.[36] The relationship between the issuer (Empire), on the one hand, and American Stock and ACS, on the other, would normally be commercial in character, arising

---

34. 12 *Del. C.* § 1203(c).

35. *See. e.g.,* William Meade Fletcher, FLETCHER CYCLOLPEDIA OF THE LAW OF CORPORATIONS § 5114 (2009).

36. Under Delaware law, the issuing corporation does not owe fiduciary duties to its stockholders. *Arnold v. Society for Savings Bancorp,* 678 A.2d 533, 539 (Del.1996); *Alessi v. Beracha,* 849 A.2d 939, 950 (Del.Ch.2004).

out of the law of agency. Whether American Stock and ACS had *any* cognizable relationship to a stockholder of the issuer (here, A.W. Financial)—commercial, fiduciary, or otherwise—as a legal matter, is addressed by the plaintiff in only a conclusory manner, and by no other party at all. The record is, therefore, not adequate to enable us to opine on the question of whether a claim for breach of fiduciary duty is viable against American stock and/or ACS.

*"Failure to Register"* and *"[S]ome other Cause of Action"*: We reach the same conclusion with respect to the balance of the question; that is, whether a viable claim for "failure to register" or "some other cause of action" exists under Delaware law. There is limited Delaware case law recognizing a statutory duty of an issuer, under both the UCC and the Delaware General Corporation Law, to register shares held by an equitable owner that seeks to become a shareholder of record. Those cases also recognize a corresponding right by the equitable owner to enforce that duty in an action for injunctive relief and hold the issuer liable in damages.[37] It is for the Southern District to decide whether such a cause of action has been adequately pleaded. Finally, the inadequacy of the record renders us unable to address the question of whether "any other cause of action" is viable under Delaware law, because that would require us to speculate on matters that the parties before us have not briefed.

### Question No. 3:

Delaware's escheat law, Del.Code Ann. tit. 12, § 1203, grants immunity in two circumstances. Subsection 1203(a) grants immunity to any "holder" of "property"— including "intangible ownership interests in corporations"—that "pay[s] or deliver[s]" that property to the State Escheator. Subsection 1203(b) grants immunity to a "holder and any transfer agent" that "deliver[s] in good faith" a "duplicate certificated security to the State Escheator." In a case such as this involving the escheatment of stock, which applies: subsection 1203(a), subsection (b), or both?

**Answer:** Only subsection 1203(b) applies in this case.

### Discussion:

12 *Del. C.* §§ 1203(a) and (b) are statutes that, in prescribed circumstances, immunize from liability certain of the actors involved in an escheat of private property to the State. These provisions operate differently. Section 1203(a) relevantly provides that:

> The payment or delivery of property to the State Escheator by any holder shall terminate any legal relationship between the holder and the owner and shall release and discharge such holder from any and all liability to the owner ... by reason of such delivery or payment, regardless of whether such property is in fact and in law abandoned property and such delivery and payment may be pleaded as a bar to recovery and shall be a conclusive defense in any suit or action brought by such owner ... by reason of such delivery or payment.[38]

On the other hand, Section 1203(b) pertinently provides that:

> Upon the delivery in good faith of a duplicated certificated security to the

---

**37.** See *Bender v. Memory Metals, Inc.,* 514 A.2d 1109 (Del.Ch.1986) (addressing duties arising under U.C.C. § 8–401 (6 *Del. C.* § 8–401), and 8 *Del. C.* § 158 in the context of an action for injunctive relief); *Reeves v. Transp.*

*Data Commc'n., Inc.,* 318 A.2d 147 (Del.Ch. 1974).

**38.** 12 *Del. C.* § 1203(a).

State Escheator or the registration of an uncertificated security to the State Escheator ... the holder and any transfer agent, registrar, or other person acting for or on behalf of the holder ... is relieved of all liability of every kind to every person.... [39]

Subsections (a) and (b) differ from each other in three important ways. First, Section 1203(a) applies broadly to the delivery of *property* as that term is statutorily defined, whereas Section 1203(b) applies more narrowly, and only to the delivery of *duplicate certificated and uncertificated securities.* Second, Section 1203(a) immunizes only "holders" of property, whereas Section 1203(b) applies more broadly, by immunizing not only holders, but also transfer agents, registrars and agents of holders. Third, Section 1203(a) immunizes a holder from "any and all" liability to an owner and its successors and assigns. Section 1203(b), in contrast, immunizes more broadly the holder, transfer agents, registrars and other agents of the holder, from liability of "every kind to every person," provided that the person seeking immunity delivers the duplicate certificated security, or registers the uncertificated security, to the State Escheator "in good faith."

Three statutorily defined terms are critical to analyzing the issues presented. The first is "property," which is broadly defined as "personal property ... of every kind or description, tangible or intangible, in the possession or under the control of a holder" including without limitation "intangible ownership interests in corporations, whether or not represented by a stock certificate, bonds and other securities...." [40]

The second critical term is "owner," which is defined, "in addition to its commonly accepted meaning," as "... any person ... having the legal or equitable title to property coming within the purview of this subchapter." [41]

And, the third critical term is "holder," which is defined as:

... any person having possession, custody or control of the property of another person and includes ... a depository, a bailee, a trustee, a receiver or other liquidating officer, a fiduciary, a governmental department, institution or agency, a municipal corporation and the fiscal officers thereof, a public utility, service corporation and every other legal entity incorporated or created under the laws of this State or doing business in this State. For purposes of this subchapter, the issuer of any intangible ownership interest in a corporation, whether or not represented by a stock certificate, which is registered on stock transfer or other like books of the issuer or its agent, shall be deemed a holder of such property.... [42]

All parties agree that subsection (b) of Section 1203 applies to the escheat at issue here, because subsection (b) is explicitly made applicable to escheats of certificated or uncertificated securities. The securities escheated here were certificated shares of Integrated Technology, which later became Empire. What is disputed is whether subsection (a) applies as well. The plaintiff contends that subsection (a) is not applicable; the defendants insist the opposite.

Our analysis begins with the indisputable fact that, read literally, subsection (a)

**39.** 12 *Del. C.* § 1203(b).

**40.** 12 *Del. C.* § 1198(11).

**41.** 12 *Del. C.* § 1198(8).

**42.** 12 *Del. C.* § 1198(7).

is applicable to the escheat at issue here, because: (i) subsection (a) applies to the payment or delivery of "property" to the State Escheator by any "holder," (ii) "property" includes "intangible ownership interests in corporations;" and (iii) "holder" includes "the issuer of any intangible interest in a corporation." Thus, if subsection (a) is applied literally, then the defendants' argument that both subsections (a) and (b) govern this case, would prevail.

The plaintiff ardently contends, however, that subsection (a) should not be applicable to escheats of securities that are explicitly governed by subsection (b). Plaintiffs argue that where (as here) duplicate certified securities or uncertificated securities are escheated to the State, the literal interpretation urged by the defendants would produce an absurd result not intended by the General Assembly. The plaintiff's argument runs as follows: subsection (a) is intended to immunize a holder who delivers property to the State Escheator, from "any and all" liability to an owner, but imposes no requirement that the delivery be made in good faith. Subsection (b), however, is limited specifically to escheats of securities. Although subsection (b) immunizes holders, transfer agents, registrars and agents of the holders from liability of "every kind to every person," it requires that the delivery be made in "good faith."

Thus, in cases where securities are escheated, there is an inherent conflict between subsections (a) and (b). Under subsection (a), a holder who delivers securities to the State Escheator is immunized from liability to the owner, irrespective of the holder's good faith. Under subsection (b), that same holder that delivers the same securities to the State Escheator is immu-

nized from liability only if the delivery is made in good faith. Therefore, plaintiff concludes, an interpretation that would make an escheat of securities by a holder/issuer subject to both subsections (a) and (b), would render the good faith requirement of subsection (b) a nullity.

The defendants do not confront this argument head-on. They argue simply that subsection (a) is unambiguous on its face and, therefore, should be given effect. We disagree.

 Subsection (a), if read in isolation and without regard to the rest of Section 1203, is clear on its face. But, when read together with subsection (b), subsection (a) makes Section 1203 as a whole ambiguous. In determining whether a statute is ambiguous, a court must consider the statute in its entirety, not merely its subsections individually.[43] A statute is ambiguous not only if it is "reasonably susceptible to different conclusions or interpretations," but also if "a literal interpretation of the words of the statute would lead to an absurd or unreasonable result that could not have been intended by the legislature."[44] To hold that escheats that are narrowly and explicitly covered by subsection (b) are also subject to subsection (a) which applies to all escheats, would create absurd results. Holders that deliver securities to the State Escheator are subject to a good faith requirement to obtain immunity under subsection (b), yet those same holders are not subject to that requirement under subsection (a). Therefore, holders that deliver securities to the State Escheator would never be certain as to the scope of their immunity from liability—a result that makes no reasonable commercial sense. The only way to avoid that uncertainty is to interpret Section

**43.** *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.,* 492 A.2d 1242, 1246 (Del.1985).

**44.** *Leatherbury v. Greenspun,* 939 A.2d 1284, 1288 (Del.2007).

1203 so as to make the immunity rules clear where securities are the property being escheated. To accomplish that, subsections (a) and (b) must be interpreted to be mutually exclusive. The issue then becomes: which of those exclusive provision applies—subsection (a) or subsection (b)?

 In our view, the only sensible construction is that subsection (b) applies exclusively, because only that interpretation would effectuate the General Assembly's intent where securities are the property being escheated. Subsection (b) is narrowly and specifically tailored to escheats of securities. Subsection (a), however, is worded universally, to cover all categories of escheated property. That interpretation is also fully consistent with the applicable rules of construction, in particular, that specific provisions should prevail over general provisions,[45] and that "words in a statute should not be construed as surplusage if there is a reasonable construction which will give them meaning."[46] To adopt the defendants' construction would nullify subsection (b)'s good faith requirement, and render it surplusage in the case of escheats of securities, which subsection (b) specifically governs. In contrast, interpreting subsection (a) as applying to escheats of all "property" other than securities covered by subsection (b), harmonizes both provisions and does no violence to subsection (a).

Lastly, the construction we adopt is the more reasonable construction from a policy standpoint. Subsection (a) which governed generally the escheatment of "property," preexisted subsection (b). Later, subsection (b) was added specifically to

govern "securities." In all likelihood, that became necessary because of the greater probability of securities being mistakenly or wrongfully turned over to the State Escheator than other, more tangible, forms of property. The owner of tangible property will normally have a more direct relationship to that property than will the owner of securities, who usually must rely on third parties to monitor the ongoing status of this intangible property form. The separation between beneficial owners and their securities, which are typically held in "street name," increases the potential for their unauthorized delivery to state escheators. To safeguard against this increased risk of improper escheatment, the General Assembly enacted subsection (b), which offers only qualified immunity to persons who turn over securities to the State Escheator. Unlike the unconditional immunity afforded to those who turn over other forms of property, securities must be turned over in good faith. The resulting increased potential for liability increases the likelihood that third parties that are entrusted with overseeing securities belonging to others will not turn those securities over to the Escheator without first diligently ascertaining that the criteria for their proper escheat are satisfied.

For these reasons, we conclude that the only immunity provision that applies in this case is 12 *Del. C.* § 1203(b).

**Question No. 4:**

When are allegations sufficient to plead that a party did not act in "good faith"—and thus is not entitled to immunity—under subsection 1203(b) of Del.Code Ann. tit. 12, § 1203?

---

**45.** *See also, Cede & Co. v. Technicolor, Inc.,* 758 A.2d 485, 494 (Del.2000) ("As a general rule of statutory construction, when a specific statute is enacted that appears to conflict with an existing general statute, the subsequently enacted specific statute is controlling.") In this case the subsequently enacted statute is § 1203(b).

**46.** *Oceanport Indus. Inc. v. Wilmington Stevedores, Inc.,* 636 A.2d 892, 900 (Del.1994).

*Answer:*

 The question appears to rest implicitly on the premise that a plaintiff owner must plead and prove that the holder, transfer agent, registrar or agent of the holder that transfers property to the State Escheator did not do so in good faith. That premise is not accurate: under Delaware law, the absence of "good faith" is not an element of a claim for relief from a wrongful escheat that a plaintiff owner must prove. Rather, "good faith" under Section 1203(b) is an affirmative defense that must be pleaded and proved by a defendant holder, transfer agent, registrar or agent of the holder that claims immunity from liability under that statute. Because "good faith" is a term defined in the Escheat Statute, it is sufficient to plead and prove good faith in accordance with that statutory definition.

*Discussion:*

 Delaware case law is clear that where good faith (or its absence) is an element of a claim or cause of action to establish civil liability, the burden of pleading and proving good faith (or the absence thereof) rests on the plaintiff. Where, for example, a shareholder claims that a corporation's directors should be held liable to the corporation for conduct in breach of their fiduciary duty to act in good faith, the plaintiff has the burden of pleading and proving their lack of good faith.[47] Conversely, where good faith is asserted as a defense, or an element of a defense, against a claim for civil relief, then the burden of pleading and proving

good faith rests with the defendant.[48] In this case, good faith would be asserted defensively by parties who are claiming immunity under Section 1203(b). Because those defendants are seeking immunity protection under that statute, they are the parties responsible for establishing that the good faith requirement has been met.

This conclusion is supported by the Escheat Statute itself. Section 1203(a) explicitly states that the "payment or delivery of property to the State Escheator:

.... may be pleaded as a bar to recovery and shall be a conclusive defense in any suit or action brought by such owner, the owner's heirs, personal representatives, successors and assigns or any claimant against the holder by reason of such delivery or payment."

That is, Section 1203(a) of the Escheat Statute explicitly provides that immunity is a defense to be pleaded by the defendant. Although the applicable immunity statute here is Section 1203(b), which does not contain the above quoted language, that omission cannot sensibly be viewed as evidencing a legislative intent to make immunity a defense that must be pleaded defensively under subsection (a), but not under subsection (b). Such a construction would make no procedural sense. Rather, the omission is better viewed as additional evidence of inartful draftsmanship that failed to harmonize the two subsections of Section 1203 at the time that provision was amended by adding subsection (b).

Because "good faith" is a term that is specifically defined in Section 1203(d) of the Escheat statute,[49] it is sufficient that

---

47. *See In Re Walt Disney Co. Derivative Litigation,* 906 A.2d 27, 52 (Del.2006); *Stone v. Ritter,* 911 A.2d 362, 372 (Del.2006).

48. See *Emerald Partners v. Berlin,* 726 A.2d 1215, 1223–24 (Del.1999) (defendants seeking exculpation from liability under charter provision adopted pursuant to 8 *Del. C.* § 102(b)(7)

"will normally bear the burden of establishing each of its elements[;]" including the element that the defendants' conduct did not constitute "acts or omissions not in good faith.")

49. 12 *Del. C.* § 1203(d) provides:

the substantive elements of the good faith defense be pleaded and proved in accordance with that statutory provision.

### Conclusion

1. The new definition of "period of dormancy" for stocks in 12 *Del. C.* § 1198(9) does not apply retroactively in civil actions involving stocks that were escheated prior to June 30, 2008.

2. Common law or statutory causes of actions against parties that are involved in an escheat transaction (other than the State of Delaware) are not superseded by the Escheat Statute. Causes of action for negligence, conversion, and "failure to register" might be available to A.W. Financial if adequately pleaded by it. We are unable to opine on the question of whether a claim for breach of fiduciary duty or "some other cause of action" is viable against defendants.

3. Only the immunity granted by 12 *Del. C.* § 1203(b) applies in this case involving escheatment of stock.

4. "Good faith" under 12 *Del. C.* § 1203(b) is an affirmative defense, the substantive elements of which (defined in 12 *Del. C.* § 1203(d)), must be pleaded and proved by the defendant that claims immunity.

### QUESTIONS ANSWERED.

For the purposes of this section, "good faith" means that: (1) [p]ayment or delivery was made in a reasonable attempt to comply with this subchapter; (2) [t]he person delivering the property was not a fiduciary then in breach of trust in respect to the property and had a reasonable basis for believing, based on the facts then known to the person, that the property was abandoned for the purposes of this subchapter; and (3) [t]here is no showing that the records pursuant to which the delivery was made did not meet reasonable commercial standards of practice in the industry.