# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DANIEL JAIYONG AN, )
                              )
         Plaintiff, )
                              )
       v. )    C.A. No. 2023-0715-LWW
                              )
RAFAEL COSMAN, ALEX DE )
LORRAINE, TOM SHIELDS, and )
ARCHBLOCK, INC., )
                              )
         Defendants. )

## MEMORANDUM OPINION

Date Submitted: April 10, 2025
Date Decided: July 31, 2025

Daniel Jaiyong An, *pro se*

A. Thompson Bayliss, Ben Lucy & G. Mason Thomson, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Counsel for Defendants Rafael Cosman, Alex de Lorraine, Tom Shields, and Archblock, Inc.*

**WILL, Vice Chancellor**

This action is brought pro se by a cofounder and former executive of a blockchain technology company. The plaintiff seeks to challenge the company's redomestication to Switzerland and asserts a litany of other grievances stemming from his 2020 termination as CEO. He lacks standing for his derivative claims, misapplies Delaware law, and provides no well-pleaded facts to support his allegations. Recent supplements to his complaint based on an unrelated SEC action offer no relief. The defendants' motions to dismiss are granted.

## I.    FACTUAL BACKGROUND

The following facts are drawn from the operative Complaint, the documents it incorporates by reference, and matters subject to judicial notice.[1]

### A.    Archblock

In 2015, plaintiff Daniel Jaiyong An and defendant Rafael Cosman incorporated defendant Archblock, Inc. (formerly known as TrustLabs, Inc.) in Delaware.[2] Archblock was a blockchain-focused software development company

---

[1] Suppl. Compl. (Dkt. 60); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a [plaintiff] expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint[.]" (citation omitted)); *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))).

[2] Suppl. Compl. ¶¶ 3, 27.

operating in the cryptocurrency space.[3]  In 2018, Archblock launched TrueUSD, a stablecoin backed by the United States dollar.[4]  It published a white paper envisioning a "TrustToken platform" to "tokeniz[e] real-world assets like real estate on the blockchain."[5]  Archblock raised $32 million from investors to execute this idea.[6]

An and Cosman held equal stakes in Archblock.[7]  An served as Archblock's CEO and President until he was terminated in July 2020.[8]  Cosman replaced An as CEO, serving from 2020 to 2022.[9]  Until his termination, An served on the Archblock Board of Directors, alongside Cosman, defendant Alex de Lorraine, and defendant Tom Shields.[10]  De Lorraine held various executive roles at Archblock over several years, including Director of Finance and Chief Operating Officer.[11]

---

[3] *Id.* ¶ 27; *see also id.* ¶ 31.

[4] *Id.* ¶ 6.

[5] *Id.* ¶¶ 5, 37; *see* Compl. (Dkt.1) Ex. 7 (draft TrustToken "White Paper").

[6] Suppl. Compl. ¶ 5.

[7] *Id.* ¶ 4.  They originally each held a 50% stake, which was subsequently diluted to 45% when others joined the company and obtained equity stakes.  *Id.* ¶¶ 4, 32.

[8] *Id.* ¶¶ 1, 13, 26. 124.

[9] *Id.* ¶ 151.

[10] *Id.* ¶¶ 2, 124, 151.

[11] *Id.* ¶ 164.

## B.     The SAFT Agreements

In 2017 and 2018, Archblock offered investors Simple Agreements for Future Tokens ("SAFTs"), which "gave investors the right to receive TRU tokens upon the launch of the TrustToken platform described in [Archblock's] white paper."[12]  The SAFTs employed a "novel legal structure"; TrustToken was the second cryptocurrency to use it.[13]

The SAFTs were "contract[s] between the [p]urchaser[s] and [Archblock]" whereby each "purchaser agree[d] to pay the Purchase Amount" in exchange for "the right to certain units of TrustToken subject to the terms of the SAFT."[14]  SAFT purchasers obtained the right to receive tokens if Archblock "public[ly] release[d] . . . the TrustToken Platform smart contracts" before October 1, 2023.[15]

In the SAFT, each purchaser agreed that future tokens did not carry "any of the rights of a stockholder of the Company or any right to vote," to "give or withhold consent to any corporate action," or to "receive subscription rights."[16]  Each purchaser also represented that it "[wa]s capable of evaluating the merits and risks

---

[12] *Id.* ¶¶ 4, 45; *see* Compl. Ex. 8 ("SAFT"); Compl. Ex. 9 ("SAFT Private Placement Offering Memo."). The TRU tokens are separate from the TrueUSD stablecoin.  *See* Suppl. Compl. ¶ 6.

[13] Suppl. Compl. ¶¶ 93-94.

[14] SAFT Private Placement Offering Memo. 5; Suppl. Compl. ¶ 48.

[15] SAFT §§ 1(a), 1(c); *see also id.* § 2 (defining "Platform Launch" and "SAFT").

[16] *Id.* § 7(d).

of such investment"[17] and agreed to "fully and completely assume" risks associated with the tokens.[18] The purchaser also acknowledged that future tokens conferred "no right against the Company or any other [p]erson except in the event of the Company's breach of [the SAFT] or intentional fraud."[19]

Despite these express contractual limitations, An felt he had a "fiduciary, contractual, and moral responsibility to [SAFT] investors" that he "t[ook] . . . with supreme ordinance."[20]

## C. An's Termination

At the advent of the COVID-19 pandemic, "[t]here was ambiguity everywhere about the future state of the world," including the economy.[21] Archblock sold its office and laid off 20% of its workforce.[22] An grew worried that Archblock "had less than 12 months o[f] runway left" in its balance sheet.[23]

An began to disagree with Archblock's strategic direction. When "it became painfully obvious that the SEC would not provide a viable regulatory pathway for 'security tokens' that would be necessary for the TrustToken Asset Tokenization

---

[17] *Id.* § 4(b).

[18] *Id.* § 4(d).

[19] *Id.* §§ 3(f), 4(e) (capitalization omitted).

[20] Suppl. Compl. ¶ 112.

[21] *Id.* ¶¶ 247, 249-50.

[22] *Id.* ¶¶ 243, 246.

[23] *Id.* ¶ 245.

4

Platform," Archblock "began exploring other commercial pathways for the TRU Tokens to follow some of the original goals proposed in the [company's] [w]hite [p]aper."[24] Archblock's other officers, including Cosman, "land[ed] on a rewards-based token for holding TrueUSD."[25] According to An, this "new direction—championed by [Cosman]—was vastly different from the original purpose of the Company and differed substantially from the [w]hite [p]aper and other . . . offering documents for the TrustToken Asset Tokenization Platform."[26]

Once Archblock began to pursue alternatives to the TrustToken platform, An came to believe that Archblock should offer SAFT purchasers updated disclosures and the "option of a refund."[27] An felt loyalty to the SAFT purchasers, though he acknowledged that giving refunds "could potentially reduce the value [to] equity holders" to whom he owed fiduciary duties.[28]

An's fellow directors and officers did not support his plan to refund SAFT purchasers, which risked Archblock having to fundraise from scratch.[29] An

---

[24] *Id.* ¶¶ 64-65; *see also id.* ¶¶ 62-63.

[25] *Id.* ¶ 66.

[26] *Id.* ¶ 67.

[27] *Id.* ¶ 7. An developed this view after "consultations with numerous internal and external counsel." *Id.* ¶¶ 103-09. He feared that failing to offer refunds could constitute securities fraud, and he noted that some investors "had already voiced concerns" about equity holders profiting while token holders did not. *Id.* ¶¶ 8-9, 110.

[28] *Id.* ¶ 118.

[29] *Id.* ¶¶ 13, 120.

5

proceeded anyway. He began messaging SAFT purchasers and deleted the company's Slack account in lieu of a program that token holders could access.[30] An also began negotiating the sale of TrueUSD to Tron—another blockchain company—but pushed to make the sale contingent on "offer[ing] a 100% refund offer to all" SAFT purchasers.[31]

Rafael and de Lorraine consequently voted An out of his position on the Board and dismissed him as CEO.[32]

### D. The Redomestication Transaction

In June 2023, the Board approved a multi-step transaction that would lead to the redomiciling of Archblock in Switzerland (the "Redomestication").[33] Under the transaction agreement, stockholders who approved the merger would receive a proportionate interest in registered shares of the Swiss stock corporation.[34] Archblock's stockholders approved the merger by written consent.[35]

---

[30] *Id.* ¶¶ 122, 225-31.

[31] *Id.* ¶¶ 260-261(g); *see also id.* ¶ 10 (text communications with the founder of Tron, in which An explained that "if we can[no]t let tru stakeholders know and the financial instituions [sic] / trueusd holders [are] offer[ed] a refund then a deal isn't feasible").

[32] *Id.* ¶¶ 13, 124, 261(g).

[33] *Id.* ¶ 191.

[34] Compl. Ex. 14 at Ex. A ("Merger Agreement") § 5.

[35] *Id.*

### E. An's Books and Records Demands

On May 17, 2021, after a series of informal requests, An served a formal books and records demand on Archblock.[36] His stated purposes were to (1) investigate his termination as CEO and replacement by Cosman, and (2) "determine if there are claims against the company arising from" its failure "to offer [SAFT] investors a potential refund."[37] In response, Archblock (then TrustLabs) explained that An's demand "d[id] not provide a credible basis of probable wrongdoing" and improperly sought documents for personal employment claims.[38]

On July 1, 2023, after the Redomestication, An sent another books and records demand.[39] He wrote that the Redomestication "raise[d] serious red flags about the self-dealing conduct of the Board of Directors and the need for a drastic change in the domicile of the company."[40] He also maintained that the Redomestication could not be approved by written consent under the Delaware General Corporation Law (DGCL).[41] Archblock rejected this demand.[42]

---

[36] Compl. Ex. 16 ("May 2021 Demand"); *see also* Compl. Ex. 15 (first informal request); Suppl. Compl. ¶ 215 (discussing An's second informal request).

[37] May 2021 Demand 2-3.

[38] Compl. Ex. 17 (May 2021 demand) 1.

[39] Compl. Ex. 18 (July 2023 demand).

[40] *Id.* at 1.

[41] *Id.*

[42] Compl. Ex. 18 (July 2023 demand response) 2.

After filing this action, An brought a books and records suit under 8 *Del. C.* § 220 (the "220 Action"), seeking documents related to his claims.[43] Archblock moved to dismiss the 220 Action for lack of proper purpose because An had filed plenary litigation.[44] Then-Magistrate David recommended dismissal of the 220 Action in a November 7, 2023 Final Report.[45] An took exception to the Final Report.[46] On April 1, 2024, I overruled An's exceptions and adopted the Final Report, dismissing the 220 Action with prejudice.[47]

### F.    This Litigation

On July 14, An filed this action pro se, raising an array of claims against Cosman, de Lorraine, Shields, and Archblock.[48] He simultaneously moved to expedite and for a temporary restraining order enjoining the Redomestication.[49] I denied both requests for lack of a colorable claim, among other reasons.[50] An

---

[43] Compl., *An v. Archblock, Inc.*, C.A. No. 2023-0754-BWD (Del. Ch.) ("220 Action") ¶¶ 17-19.

[44] 220 Action, Dkts. 9-10.

[45] 220 Action, Dkt. 16; 220 Action, Dkt. 19 ("Final Report").

[46] 220 Action, Dkt. 20.  He also served an additional informal demand, which Archblock again rejected.  220 Action, Dkt. 22 Exs. 2-3.

[47] 220 Action, Dkt. 25.

[48] Dkt. 1.

[49] Dkts. 3-4.

[50] Dkts. 10-11; *see* Dkt. 22.

8

requested reargument of his motion to expedite, which I denied.[51] The Redomestication subsequently closed.

Archblock and the individual defendants moved to dismiss An's complaint.[52] Briefing was delayed while An's exceptions to the Final Report in the 220 Action were under review. After the 220 Action concluded, the parties resumed briefing in this case.[53] They asked that the motion be resolved without oral argument.[54]

On October 4, An moved for leave to file a supplemental brief "addressing newly discovered evidence that is highly relevant to the pending [m]otion[s] to [d]ismiss."[55] I denied that motion because An had not moved to supplement his complaint and could not amend his pleading through briefing.[56] An then moved for leave to file a supplemental complaint to add information from a suit filed by the

---

[51] Dkts. 12, 21.

[52] Dkts. 28-29.

[53] Defs.' Opening Br. in Supp. of Mots. to Dismiss Pl.'s Verified Compl. (Dkt. 35) ("Defs.' Opening Br."); Pl.'s Opp'n to Defs.' Opening Br. in Supp. of Mots. to Dismiss Pl.'s Verified Compl. (Dkt. 36) ("Pl.'s Answering Br."); Defs.' Reply Br. in Further Supp. of Mots. to Dismiss Pl.'s Verified Compl. (Dkt. 38) ("Defs.' Reply Br."). Since An's brief lacks internal pagination, citations to his brief refer to the document's page number.

[54] Dkt. 37.

[55] Dkts. 40, 45, 47.

[56] Dkt. 49.

Securities and Exchange Commission (SEC).[57]  I granted An's motion in part, and

allowed him to add certain allegations in compliance with Rule 15(d).[58]

An filed the operative supplemental Complaint on March 21, 2025.[59]  The

defendants filed a responsive supplemental submission on April 10.[60]  At that point,

the motions to dismiss were taken under advisement.

## II.    ANALYSIS

An's Complaint advances ten counts:

- Counts I, III, and IV are breach of fiduciary duty claims against the individual defendants regarding the Redomestication, the sale of Archblock assets to Tron, and the alleged transfer of TRU tokens to a company affiliated with certain individual defendants.[61]

- Count II seeks a declaration that the Redomestication is invalid.[62]

- Count V is breach of contract claim against Archblock and Cosman regarding an alleged severance agreement.[63]

---

[57] Dkt. 50, 56, 57.

[58] Dkt. 59; *see* Ct. Ch. R. 15(d).

[59] Dkt. 60.  The supplemental Complaint (and before it the original Complaint) has two counts each titled "Count V" and two counts each titled "Count VII."  To minimize confusion, I refer to the counts in the order pleaded.  That is, I treat the second Count V as Count VI; Count VI as Count VII; the first Count VII as Count VIII; the second Count VII as Count IX; and Count VIII as Count X.

[60] Dkts. 60-61.

[61] Suppl. Compl. ¶¶ 301-03, 308-14.

[62] *Id.* ¶¶ 304-07.

[63] *Id.* ¶¶ 315-18.

- Count VI is an "unjust enrichment [and] corporate waste" claim against the individual defendants regarding the transfer of TRU tokens.[64]

- Count VII requests an accounting "for all of the corporate assets wasted or misused by the [i]ndividual [d]efendants."[65]

- Count VIII, is a breach of fiduciary duty claim against all defendants for "betray[ing] [An's] reasonable expectations as a large minority shareholder and co-founder."[66]

- Count IX requests equitable rescission of purported agreements "entered into based on misrepresentations regarding [An's] ongoing role and rights in the company."[67]

- Count X is a declaratory judgment claim for "affirm[ance] [of] [An's] rights as a founding [Archblock] shareholder."[68]

The defendants have moved to dismiss each of these claims under Court of Chancery Rule 12(b)(6).[69] I must "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, [and] (3) draw all reasonable inferences in favor of the non-moving party . . . ."[70] This plaintiff-friendly standard does not, however,

---

[64] *Id.* ¶ 60 (capitalization removed); *id.* ¶¶ 319-21.

[65] *Id.* ¶¶ 322-23.

[66] *Id.* ¶¶ 324-26.

[67] *Id.* ¶¶ 327-29.

[68] *Id.* ¶¶ 330-32.

[69] Defs.' Opening Br. 16-17.

[70] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

11

require me "to accept every strained interpretation of [the plaintiff's] allegations."[71] Nor must I accept conclusory assertions "unsupported by allegations of specific facts."[72]

I resolve the motions by addressing An's claims categorically. I begin with the breach of fiduciary duty claims in Counts III, IV, and VI, which are derivative. I then address the claims in Counts I and II related to the Redomestication; the contract-related claims in Counts V and IX; the stockholder rights claims in Counts VIII and X; and the accounting claim in Count VII. None are reasonably conceivable.

## A. The Derivative Claims

Three of An's claims—Counts III, IV, and VI—involve alleged self-dealing by the individual defendants. Though An styles the claims as direct ones, the defendants insist that they are derivative.[73] The defendants argue that An lacks derivative standing to pursue the claims because (1) the Redomestication closed and (2) he is pro se.

---

[71] *Gen. Motors (Hughes)*, 897 A.2d at 168 (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001)).

[72] *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 727 (Del. Ch. 1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

[73] *See* Defs.' Opening Br. 22.

A plaintiff's standing is "a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers."[74] "Once standing is lost, the court lacks the powers to adjudicate the matter, and the action will be dismissed as moot unless an exception applies."[75] A plaintiff pressing a claim on an entity's behalf necessarily invokes derivative standing, which is a "creature of equity" by which this court "exercise[s] jurisdiction over corporate claims asserted by stockholders."[76]

### 1. Direct or Derivative

Delaware courts apply the *Tooley* test to determine whether a stockholder's claim is direct or derivative.[77] That inquiry "turn[s] solely on the following questions: (1) who suffered the alleged harm (the corporation or the stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[78] "The manner in which a plaintiff labels its claim and the form of words used in the complaint are not

---

[74] *Dover Hist. Soc'y. v. City of Dover Plan. Comm'n.*, 838 A.2d 1103, 1110 (Del. 2003); *see* Ct. Ch. R. 12(b)(1).

[75] *El Paso Pipeline GP Co., L.L.C. v. Brinkerhoff*, 152 A.3d 1248, 1256-57 (Del. 2016).

[76] *Id.* at 1256 (citing *Schoon v. Smith*, 953 A.2d 196, 202 (Del. 2008)).

[77] *See Tooley v. Donaldson, Lufkin & Jenrette Inc.*, 845 A.2d 1031 (Del. 2004).

[78] *Id.* at 1033.

dispositive; rather, the court must look to the nature of the wrong alleged, taking into account all of the facts alleged in the complaint, and determine for itself whether a direct claim exists."[79]

An asserts that the individual defendants breached their fiduciary duties by: (1) selling "substantially all of [Archblock's] assets, specifically . . . the TrueUSD token to Tron, without stockholder approval in or around September 2020" (Count III); (2) "caus[ing] the Company to transfer its holdings in TRU tokens to a Cayman Islands company affiliated with them or some of them without stockholder approval" (Count IV); and "award[ing] themselves tens of millions of dollars['] worth of TRU tokens in 2020 after removing [An] as CEO without ever seeking any stockholder approval or notice" (Count VI).[80] These claims are each derivative.

Counts III, IV, VI involve the alleged misuse of corporate resources—either for alleged personal gain or, in the case of Count III, for unknown reasons.[81] "Claims of corporate mismanagement are classically derivative claims because, if proven,

---

[79] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *16 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012).

[80] Suppl. Compl. ¶¶ 290-91, 297-98, 301-03, 308-14.

[81] *See supra* notes 61, 64, and accompanying text. For Count III, An states that "[i]t is unknown whether the [i]ndividual [d]efendants applied the proceeds of that sale to benefit themselves or [Archblock]." Suppl. Compl. ¶ 311.

they represent 'direct wrong to the corporation that is indirectly experienced by all shareholders.'"[82]

Count III involves a sale of corporate assets that allegedly "devalue[d]" the TrueUSD token, which is a "a textbook derivative claim."[83]

Counts IV and VI are based on Cosman and de Lorraine's alleged "transfer[ring] at a de minim[i]s value the remaining TRU tokens from the Company (which at the time had a market value of hundreds of millions of dollars) to a new Cayman [e]ntity, that [they] control as sole board members."[84]  An is claiming that "corporate fiduciaries, in breaching their duties, caused an exchange of assets or equity at a loss to the corporation."[85]  This sort of claim is "viewed as 'exclusively derivative' under the *Tooley* analysis."[86]

---

[82] *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *17 (Del. Ch. Mar. 31, 2017) (citing *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1998)).

[83] *BET FRX LLC v. Myers*, 2022 WL 1236955, at *7 (Del. Ch. Apr. 27, 2022).

[84] Suppl. Compl. ¶ 190.  Count VI mentions only the award of TRU tokens.  The similarity between the facts raised in this claim and those underpinning Count IV suggests that the individual defendants' alleged gain concerns the purported transfer to the Cayman entity. *Compare* Suppl. Compl. ¶¶ 313-14 (Count IV asserting that the individual defendants breached their fiduciary duties by "caus[ing] the Company to transfer its holdings in TRU tokens to a Cayman Islands company affiliated with them or some of them without stockholder approval"), *with id.* ¶ 320 (Count VI asserting that the individual defendants committed unjust enrichment and corporate waste by awarding themselves TRU tokens).

[85] *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 802 (Del. Ch. 2022).

[86] *Id.*

15

An insists that he "is not asserting these claims derivatively on behalf of [Archblock], but rather directly as an individual shareholder who has been uniquely harmed by [the d]efendants' conduct."[87]  He describes that "unique harm" as affecting him as "a 45% shareholder through exclusion from dividends, denial of information rights, and oppressive conduct."[88]  But I must "look beyond the labels used to describe the claim, evaluating instead the nature of the wrong alleged."[89]  Under *Tooley*, the harm he complains of is to the corporation, and any renumeration or remedy would likewise be directed to it.[90]  These claims are derivative.

### 2. Lack of Derivative Standing

An lacks derivative standing to pursue Counts III, IV, and VI.

First, the Redomestication has closed.[91]  An is no longer a stockholder of the company.  A plaintiff "who ceases to be a stockholder, whether by reason of merger or for any other reason, loses standing to continue a derivative suit."[92]

---

[87] Pl.'s Answering Br. 13-14.

[88] *Id.* at 14.

[89] *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *7 (Del. Ch. July 26, 2018).

[90] *See supra* note 78 and accompanying text.

[91] Defs.' Ex. 1.

[92] *Lewis v. Anderson*, 477 A.2d 1040, 1049 (Del. 1984).

There is an exception to this rule where the merger that caused the stockholder to lose standing is "itself . . . the subject of a claim for fraud."[93] An contends that this exception is met because the Redomestication was pursued for the fraudulent purpose of diluting him and evading regulation.[94] I reject this theory below.[95] In any event, the fraud exception applies "only in the limited circumstance where the merger itself is being perpetrated merely to deprive shareholders of their standing to bring the derivative action," which An has not alleged.[96]

Second, regardless of the purpose or validity of the Redomestication, An cannot pursue derivative claims pro se. "A derivative plaintiff, who steps into the shoes of the corporation, . . . must be represented by counsel."[97]

Counts III, IV, and VI are therefore dismissed.

---

[93] *Id.* at 1046 n.10.

[94] Pl.'s Answering Br. 13.

[95] *See infra* Section II.B.1.

[96] *See Ark. Tchr. Ret. Sys. v. Countrywide Fin. Corp.*, 75 A.3d 888, 897 (Del. 2013) (cleaned up).

[97] *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 2006 WL 903578, at *2 n.4 (Del. Ch. Apr. 3, 2006); *see also Pope v. Hycroft Mining Hldg. Corp.*, 2024 WL 3352852, at *3 (Del. Ch. July 9, 2024) ("Courts have universally held that Rule 23(a)(4)'s adequacy requirement prevents pro se litigants from serving as class representatives. 'This is so because class counsel's ability to adequately protect the interests of the class depends in large part on counsel's competence, and a pro se plaintiff almost always lacks the requisite experience and knowledge of the law to be entrusted with the class's claims in addition to his own.'" (citing 1 William B. Rubenstein, *Newberg and Rubenstein on Class Actions* § 3:79 (6th ed. 2023)); *Kelly v. Fuqi Int'l, Inc.*, 2013 WL 135666, at *7 (Del. Ch. Jan. 2, 2013) ("A derivative action may not be brought pro se . . . .").

**B.    The Redomestication Claims**

An brings two other claims challenging the Redomestication.  Count I asserts that the individual defendants breached their fiduciary duties by approving the Redomestication.  Count II seeks a declaration that the Redomestication violates Delaware law.  Both counts fail to state a claim (insofar as Count II is not moot).[98]

### 1.    Breach of Fiduciary Duty

An claims that the individual defendants breached their fiduciary duties "by approving the [Redomestication] to benefit themselves and without any justification."[99]  He avers that the Redomestication was undertaken to "evade regulatory oversight and dilute [An']s shareholder interests, thereby violating [the individual defendants'] fiduciary duties and undermining the integrity of corporate governance."[100]  As a result, An argues that the Redomestication "was not a valid exercise of business judgment but rather pursued for improper purposes."[101]

---

[98] Because the Redomestication has closed, An's request that it "be enjoined from consummation" is moot.  Suppl. Compl. ¶ 307; *see, e.g.*, *In re Straight Path Commc'ns Inc. Consolidated S'holder Litig.*, 2018 WL 3120804, at *8 (Del. Ch. June 25, 2018).

[99] Suppl. Compl. ¶ 302.

[100] Pl.'s Answering Br. 8; *see also* Suppl. Compl. ¶ 192 ("[An] [was] informed by attorneys that [the Redomestication] [wa]s likely an attempt to skirt regulation further and/or dilute [him] as a shareholder.").

[101] Pl.'s Answering Br. 8-9.  An cites *In re Tesla Motors, Inc. Stockholder Litigation* for the notion that "allegations of improper purpose [are] sufficient to overcome [the] business judgment rule." *Id.* (citing 2018 WL 1560293, at *13 (Del. Ch. Mar. 28, 2018)).  But *Tesla* did not say that.  Vice Chancellor Slights held that "the [c]omplaint plead[ed] facts that allow[ed] reasonable inferences that Musk was a controlling stockholder," and considered the claims under the entire fairness standard. *Tesla*, 2108 WL 1560293, at *12.  I fear that

Delaware law presumes that "in making . . . business decision[s,] the directors of a corporation act on an informed basis, in good faith and in the honest belief that the action[s] taken [are] in the best interests of the company."[102] "Under the business judgment rule, the burden of pleading and proof is on the party challenging the decision to allege facts to rebut th[is] presumption."[103] A plaintiff "can rebut the presumption by showing the board was interested in the challenged transaction or lacked independence."[104] An has done neither.

First, the Complaint lacks any well-pleaded allegations supporting a reasonable inference that the Redomestication was undertaken to somehow evade federal law. An does not explain how relocating to Switzerland would allow Archblock to escape regulation or liability for securities law violations. He sought to bolster his claims by supplementing his Complaint with allegations about an SEC enforcement action brought against Archblock in 2024.[105] Yet the SEC's claims involve matters post-dating An's tenure. The SEC action concerns the sale of

An's miscite stems from use of generative artificial intelligence. *See An v. Archblock, Inc.*, 2025 WL 1024661 (Del. Ch. Apr. 4, 2025).

[102] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009).

[103] *Solomon v. Armstrong*, 747 A.2d 1098, 1111-12 (Del. Ch. 1999), *aff'd*, 746 A.2d 277 (Del. 2000).

[104] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *21 (Del. Ch. Oct. 24, 2014).

[105] *See supra* notes 57-59 and accompanying text.

19

TrueUSD tokens between November 2020 and April 2023.[106]  An's claims, by contrast, are about fundraising through SAFTs in 2017 and 2018 to develop a blockchain software platform.[107]  The two complaints are about separate transactions involving different people.[108]

Second, An does not adequately plead that the individual defendants were interested in the Redomestication.  In *Maffei v. Palkon*, the Delaware Supreme Court held that the business judgment rule governs decisions to reincorporate absent non-speculative allegations that the fiduciaries secured a "material, non-ratable benefit."[109]  No such benefit is described in the Complaint; the SEC action does not supply one.[110]

Third, An never explains how the Redomestication diluted him.  It involved a stock-for-stock merger, and stockholders who did not exercise appraisal rights

---

[106] Defs.' Suppl. Submission Ex. A ("SEC Compl.") ¶ 1.  Since An "expressly refers to and heavily relies upon" the SEC Complaint, it is "considered to be incorporated by reference into [his] complaint[.]"  *Freedman*, 2012 WL 1345638, at *5; *see also supra* note 1.

[107] *See supra* Section I.B.

[108] *Compare* Suppl. Compl. ¶ 14 (explaining that the defendants' alleged "avoid[ance of] their disclosure obligations" came "at the expense of the original SAFT [purchasers]"), *with* SEC Compl. ¶¶ 1, 3 (challenging the sale by Archblock affiliates of TrueUSD tokens, meaning that the purportedly defrauded persons were the purchasers of TrueUSD tokens).

[109] -- A.3d --, 2025 WL 384054, at *28 (Del. Feb. 4, 2025).

[110] *See supra* note 108 and accompanying text.

would receive a proportionate interest in ordinary registered shares of a Swiss stock corporation.[111] An does not refute this fact or otherwise justify his dilution theory.

Fourth, An's view that the Redomestication lacked "any justification" is irrelevant. Delaware law does not require the defendants to state a business purpose for the transaction.[112] The Board did, however, "approve[]" and declare[]" the Redomestication to be "advisable" and "in the best interest of Archblock and its stockholders."[113] An offers no well-pleaded ground to second-guess the Board's judgment.

### 2. Compliance with Delaware Law

An also claims that the defendants violated "the prescribed rules under Delaware law, the Company's Certificate of Incorporation, [and] the Company's Bylaws for the approval of" the merger leading to the Redomestication.[114] The purported violations concern the "fail[ure] to follow proper procedures for obtaining

---

[111] Merger Agreement § 5; *see also supra* note 34 and accompanying text.

[112] Suppl. Compl. ¶ 302; *see Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del. 1983) (declaring that the "business purpose test" applied by a trilogy of prior decisions "was a departure from prior case law" and "no longer . . . of any force or effect"); *see also Wilen v. Pollution Control Indus., Inc.*, 1984 WL 8272, at *5 (Del. Ch. Oct. 15, 1984) (explaining that, following *Weinberger*, allegations that a merger "served no valid business purpose" are "no longer a sufficient reason to challenge a merger").

[113] Merger Agreement 1 (Recitals).

[114] Suppl. Compl. ¶¶ 303, 305. This theory relates to both Counts I and II—again, if Count II survives.

21

stockholder approval."[115]  The Complaint lacks any allegations to support that assertion.  Archblock's stockholders acted by written consent to adopt the merger agreement.[116]  The DGCL authorizes action by written consent, and Archblock's charter and bylaws expressly permit it.[117]

An therefore fails to state a viable breach of fiduciary duty claim (Count I) or claim for declaratory relief (Count II) regarding purported violations of the DGCL or the Company's constitutive documents.

### C. The Contract Claims

An seeks both legal and equitable remedies for alleged breaches of purported agreements.  In Count V, An asserts that Archblock and Cosman breached a "severance agreement" that he and Cosman reached by email.[118]  In Count IX, he demands equitable rescission of "agreements pertaining to founder shares, equity splits, and token allocations between [An] and other [Archblock] founders [that]

---

[115] Pl.'s Answering Br. 10.

[116] Suppl. Compl. ¶ 271 (discussing the June 14, 2023 written consent).

[117] *See* 8 *Del. C.* § 141(f); Compl. Ex. 5 (Archblock's certificate of incorporation) § 3; Compl. Ex. 6 (Archblock's bylaws) § 1.11(a).  In his answering brief, An argues that "[the d]efendants' contention that the DGCL and company documents allow action by written consent misses the point" because the issue is not whether action by written consent was permitted but "whether proper procedures were actually followed," which he calls "a factual question not appropriate for resolution on a motion to dismiss."  Pl.'s Answering Br. 10.  An neglects to raise this theory in his Complaint or plead which procedures were violated.

[118] *See supra* note 63 and accompanying text.

were entered into based on misrepresentations regarding [An's] ongoing role and rights in the company."[119] These claims fail because An does not adequately plead that any such agreements exist.

### 1. Breach of Contract

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) resulting damage to the plaintiff."[120] "[A]ll essential terms of [an] agreement must be sufficiently definite to establish an enforceable contract."[121]

An fails to plead that the purported contract underpinning Count V was formed. The Complaint states only that An and Cosman "wrote a spreadsheet with agreements for what would happen if either one of [them] were to depart" using the codenames "Roger and Jorge (as opposed to Rafael and Jai) as a substitute filler during these negotiations as an aid toward objectivity and how to design a fair contract between both parties."[122] Though no spreadsheet is provided, An offers a screenshot referring to "[t]okens already vested" and "[t]okens to be vested" for

---

[119] Suppl. Compl. ¶¶ 327-29.

[120] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

[121] *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *6 (Del. Ch. Feb. 18, 2015); *see also Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) ("[A] valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchange legal consideration").

[122] Suppl. Compl. ¶¶ 283, 285.

Roger and Jorge, which he claims "demonstrates a clear contract by the Company to provide compensation in the form of tokens to its founders."[123] He does not say that the parties reduced these considerations into an agreement with complete terms.[124]

Even if the Complaint adequately pleads the existence of a contract, An neglects to cite a specific provision that was breached. Delaware law requires a plaintiff to "identify a provision of the relevant contract that allegedly was breached and provide a basic explanation [of] why a breach occurred" so the defendant is "fairly placed on notice of the nature of the plaintiff's claim."[125] An asserts only that he and Cosman "agreed to terms of separation in the event that one of [them] departed from [Archblock]" and that "[n]either [Cosman] nor [Archblock] has fulfilled those terms."[126] The individual defendants are "left to guess" which term was broken.[127]

---

[123] *Id.* ¶¶ 284, 287-90. An included another screenshot with a graph of the "TRU Token Distribution Schedule (Actual + Projection)" stating: "Company signs agreement with Raf and Jai to the effect of '*Split of compensation between Roger and Jorge in the event of a change of control would be based on vested shares and not unvested shares*.'" *Id.* ¶ 290. This screenshot is devoid of context.

[124] *See id.* ¶¶ 260-61 (discussing plural "agreements" and unspecified "documents" evidencing them).

[125] *IAC Search, LLC v. Conversant LLC*, 2017 WL 3500244, at *1 (Del. Ch. Jan. 13, 2017).

[126] Suppl. Compl. ¶¶ 316-17.

[127] *IAC Search*, 2017 WL 3500244, at *1; *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006) (affirming the dismissal of a breach of contract claim where the amended complaint failed to "identify any express contractual provision that was breached"); *US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *5-7 (Del. Ch. June 18, 2018) (dismissing a claim for breach of contract where "plaintiffs did not

24

## 2. Rescission

"Equitable rescission . . . is a form of remedy in which, in addition to a judicial declaration that a contract is invalid and a judicial award of money or property to restore plaintiff to his original condition is made, further equitable relief is required."[128] It "typically requires that the court cause an instrument, document, obligation, or other matter affecting plaintiff's rights and/or liabilities to be set aside and annulled, thus restoring plaintiff to his original position and reestablishing title or recovering possession of property."[129] But in Count IX, An identifies no "instrument, document, obligation, or other matter" to be rescinded.

Instead, An complains that he was induced to enter unspecified "agreements" about "founder shares, equity splits, and token allocations."[130] He seeks "equitable rescission and cancellation of *any* agreements that unjustly enriched other founders . . . to the detriment and exclusion of [An]."[131] Without identifying the

---

identify in their [c]omplaint a specific provision in the [contract] that [the defendant] allegedly breached"), *aff'd*, 202 A.3d 510 (Del. 2019).

[128] *E.I. Du Pont De Nemours & Co. v. HEM Rsch., Inc.*, 1989 WL 122053, at \*3 (Del. Ch. Oct. 13, 1989).

[129] *Id.*

[130] Suppl. Compl. ¶ 328.

[131] *Id.* ¶ 329 (emphasis added).

specific agreements for which rescission is sought, An fails to give the defendants notice of the claim against them as required by Court of Chancery Rule 8.[132]

*　　　*　　　*

An asks that I excuse any pleading deficiencies in Counts V and IX because Archblock withheld relevant documents from him.[133] But as explained in the 220 Action, An opted to file this plenary suit before exhausting his inspection rights.[134] At any rate, that he "has asked for information" Archblock "refused to provide[] . . . does not relieve [An] of his burden to plead sufficient facts to place [the d]efendants on notice of his claims."[135]

---

[132] *See* Ct. Ch. R. 8; *see VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003) (noting that Rule 8 is intended to "give the defendant fair notice of a claim" being brought against it).

[133] Pl.'s Answering Br. 28 ("It would be inequitable to allow Defendants to benefit from their own withholding of information by obtaining dismissal of a validly pled claim.").

[134] *See* Final Report 13.

[135] *Hindlin v. Gottwald*, 2020 WL 4206570, at *4 (Del. Ch. July 22, 2020).

**D.      The Stockholder Rights Claims**

An next brings claims concerning his status as an Archblock stockholder. In Count VIII, he alleges that the defendants breached their fiduciary duties by "oppress[ing]" him and "betraying [his] reasonable expectations as a large minority shareholder and co-founder."[136]    In Count X, he requests declaratory relief "affirming [his] rights as a founding [Archblock] shareholder," including "rights to access corporate records, receive pro rata dividends and distributions, maintain voting rights, and exercise all other shareholder rights and privileges."[137]

Both claims rest on a misapprehension of Delaware law, which grants no special protections to minority or "founding" stockholders. Delaware does not recognize a cause of action for "minority stockholder oppression."[138]    Fiduciaries must generally "act to serve an overriding or paramount interest of the corporation

---

[136] Suppl. Compl. ¶ 326.

[137] *See supra* notes 66, 68, and accompanying text.

[138] *See Nixon v. Blackwell*, 626 A.2d 1366, 1380-81 (Del. 1993) ("It . . . would be inappropriate judicial legislation for this Court to fashion a special judicially-created rule for minority investors when the entity does not fall within those [close-corporation] statutes, or when there are no negotiated special provisions in the certificate of incorporation, by-laws, or stockholder agreements."); *Verdantus Advisors, LLC v. Parker Infrastructure P'rs, LLC*, 2020 WL 5951368, at *5 (Del. Ch. Oct. 8, 2020) (ORDER) ("There is no standalone remedy for stockholder oppression in Delaware."); *see also Lidya Hldgs Inc. v. Eksin*, 2022 WL 2724649, at *4 (Del. Ch. Jan. 31, 2022) (dismissing a claim for "stockholder oppression").

or its shareholders as a group, even if, as an incidental result, the interests of a subgroup . . . were adversely affected."[139]

The alleged harms that An invokes—denial of "token dividends," his firing as CEO, and rejection of his books and records demands—cannot support breach of fiduciary duty claims. An was not owed fiduciary duties in his capacity as an Archblock employee or a future token holder.[140] He was owed no right to remain CEO. And Archblock's rejection of a Section 220 demand is not a breach of fiduciary duty by the individual defendants.[141]

### E. The Accounting Request

Count VII requests an accounting "for all of the corporate assets wasted or misused by the [i]ndividual [d]efendants."[142] "An accounting is not so much an

---

[139] *Gilbert v. El Paso Co.*, 1988 WL 124325, at *10 (Del. Ch. Nov. 21, 1988), *aff'd*, 575 A.2d 1131 (Del. 1990)).

[140] *See Riblet Prods. Corp. v. Nagy*, 683 A.2d 37, 37 (Del. 1996) ("[A]lthough majority stockholders have fiduciary duties to minority stockholders *qua* stockholders, those duties are not implicated when the issue involves the rights of the minority stockholder *qua* employee under an employment contract."); *Juran v. Bron*, 2000 WL 1521478, at *9 (Del. Ch. Oct. 6, 2000) ("If the minority shareholder/partner/employee is injured in his capacity as a shareholder or partner, the acts against him may be a breach of fiduciary duty. Where, however, the person is injured as an employee, such as in a breach of an employment contract situation, his remedy would be under the contract."); *McRitchie v. Zuckerberg*, 2024 WL 1874060, at *16–17 (Del. Ch. Apr. 30, 2024) ("Creditors never become the beneficiaries of director duties. The same principle applies to holders of other contractual rights against the corporation, be they customers, suppliers, or employees").

[141] *See generally A.W. Fin. Servs., S.A. v. Empire Res., Inc.,* 981 A.2d 1114, 1127 n.36 (Del. 2009) (explaining that entities owe no fiduciary duties to stockholders).

[142] Suppl. Compl. ¶ 323.

action as it is a form of relief."[143] As An acknowledges, it requires—at a minimum—an underlying claim supporting this remedy.[144] Since none of his claims survive, he is not entitled to an accounting.

## III. CONCLUSION

Counts III, IV, and VI are derivative claims that An lacks standing to pursue. Counts I and II (insofar as it is not moot) regarding Redomestication, Counts V and IX regarding purported agreements, Counts VIII and X regarding stockholder rights, and Count VII for an accounting each fail to state a claim on which relief can be granted. This action is dismissed with prejudice.

---

[143] *Rhodes v. Silkroad Equity, LLC*, 2007 WL 2058736, at *11 (Del. Ch. July 11, 2007).

[144] *See* Pl.'s Answering Br. 20 (citing *Stevanov v. O'Connor*, 2009 WL 1059640, at *15 (Del. Ch. Apr. 21, 2009) ("A claim for an accounting . . . generally reflects a request for a particular type of remedy, rather than an equitable claim in and of itself.")).